# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### 1:23-cv-00891

| | |
|---|---|
| SEMONE  BRISSON,　　　　　　　) | |
| 　　　　　　　　　　　　　　　) | |
| 　　Plaintiff,　　　　　　　　) | |
| 　　　　　　　　　　　　　　　) | |
| 　　　　　v.　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　) | **COMPLAINT** |
| SALISBURY HOUSING AUTHORITY) | **(JURY DEMAND)** |
| (also known as Housing Authority of　) | |
| Salisbury, NC), SALISBURY　　　) | |
| HOUSING CORPORATION, INC.,　) | |
| and BRADLEY MOORE, in his　　) | |
| individual capacity,　　　　　　) | |
| 　　　　　　　　　　　　　　　 | |
| 　　Defendants. | |

Semone  Brisson, by and through her attorneys, New South Law Firm, alleges and states as follows:

## PRELIMINARY STATEMENT

1. The Plaintiff, Semone  Brisson, brings this action against the Housing Authority of Salisbury, NC (also known as and referred to throughout this Complaint as Salisbury Housing Authority (SHA), the Salisbury Housing Corporation, Inc., and Bradley Moore, in his

1

individual capacity, (collectively the "Defendants") for violations of the Americans with Disabilities Act ("ADA") as amended by the ADA Amendments Act ("ADAAA"), 42 U.S.C. §§ 12101 to 12213 (collectively, the "ADA") and the North Carolina Persons with Disabilities Protection Act, N.C. Gen. Stat. Chapter 168A (NCDPA).

## PRELIMINARY STATEMENT

2. Defendants hired Plaintiff into a full-time position as an Occupancy Specialist in September 2022 for the SHA after she had been working for the SHA for more than four years. Plaintiff had worked for the SHA in various capacities since January 2018. During her tenure at the SHA, Plaintiff had excellent job performance. Despite Plaintiff's many achievements, after Plaintiff disclosed she had a disability and asked to identify a reasonable accommodation for it, Defendants discriminated against and fired her in retaliation on October 3, 2022. As a result, Plaintiff has suffered significant damages.

## JURISDICTION

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this is a civil action arising under the ADA. This court also has supplemental jurisdiction over Plaintiff's related claims arising under state pursuant to 28 U.S.C. § 1367(a).

## VENUE

4. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), because upon information and belief Defendant Moore resides in this district and the other Defendants have their principal place of business in the district, and because a substantial part of the events or omissions giving rise to the claim occurred in this district and there is no other district in which the action may otherwise be brought.

## CONDITIONS PRECEDENT

5. On March 27, 2023, Plaintiff timely filed a charge of disability discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC).

6. On or about July 22, 2023, the EEOC issued Plaintiff a Notice of Right to Sue. This Complaint has been filed within 90 days of

receipt of that notice. Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under the ADA.

## PARTIES

7.   Plaintiff resides in Salisbury, North Carolina and is a citizen of North Carolina.

8.   Plaintiff was an employee, as defined by the ADA and NCDPA and worked for the Defendants in several capacities, but most finally as an Occupancy Specialist for the SHA in Salisbury, North Carolina (Salisbury or Salisbury, NC), until she was terminated on October 3, 2022.

9.   Upon information and belief, Bradley Moore is an individual who resides in in Rowan County, North Carolina and is a citizen of North Carolina. He has served as the Executive Director of Defendant SHA at all times relevant to the allegations in this Complaint.

10.   Upon information and belief, Defendant Salisbury Housing Authority (SHA or Defendant SHA) is a Section 8 and Public Housing public housing agency in Salisbury, North Carolina

Case 1:23-cv-00891-WO-JLW   Document 1   Filed 10/20/23   Page 4 of 57

created under the laws of the State of North Carolina, specifically Chapter 157, Article 1 of the General Statutes of North Carolina. Upon information and belief, together with Defendant Salisbury Housing Corporation, Defendant SHA is responsible for the administration and distribution of funds distributed for Section 8 housing in Salisbury, NC, by the U.S. Department of Housing and Urban Development (HUD). Defendant SHA maintains offices and does business in Salisbury, NC. Defendant SHA is an employer as defined by the ADA and the NCDPA.

11. Upon information and belief, Defendant Salisbury Housing Corporation (SHC) is a nonprofit corporation registered with the Secretary of State, and does business in Salisbury, NC. Upon information and belief, together with Defendant SHA, Defendant SHC is responsible for the administration and distribution of funds distributed for Section 8 housing in Salisbury, NC, by the U.S. Department of Housing and Urban Development (HUD). Defendant SHC maintains offices and does business in Salisbury, NC. Defendant SHC is an employer as defined by the ADA and the

NCDPA.

## FACTS

12.   Plaintiff Semone  Brisson began working for Defendants in 2018, in various positions.  In September 2022, Plaintiff started a full time position as an Occupancy Specialist and as a result was provided an office in the main office of the SHA, where she was expected to work for the majority of her full-time hours.

13.   Brisson had chemical sensitivities and allergies starting in early adult years. She has sought and continues to seek medical treatment.  Brisson experiences mild to moderate, but not life threatening, chemical sensitivities to certain substances, including but not limited to air fresheners, scented candles, and aerosol disinfectant spray.

14.   Brisson's symptoms from exposure include allergic/immune system reactions such as mild to severe breathing difficulty, bronchial inflammation, headache, sinus inflammation, sinus drainage resulting in fluid in her ears, foggy thinking, and headaches.  Her symptoms can vary in duration, kind, and severity/intensity

depending on the concentration of the chemicals and length of exposure.

15. For all of her career at the SHA prior to her new position as Occupancy Specialist working in the offices of the SHA located at 200 Martin Luther King Jr. Avenue in Salisbury, Brisson was able to adjust her working conditions to avoid any prolonged exposure to chemicals without the need to ask management for any accommodation.

16. This ability to provide her own accommodation meant that prior to September 2022, she was only subjected to brief exposures at low concentrations. In addition, even when briefly exposed to low concentrations of chemicals to which she was sensitive, she could follow the exposure with access to clear air immediately which allowed her to ameliorate the effects of the exposure.

**FIRST INCIDENT OF CHEMICAL EXPOSURE**

17. When Defendant Moore offered Brisson the Occupancy Specialist job full time, she asked him for two weeks off in which to get some things in order, which Moore indicated he thought was reasonable

7

and suggested that she start her new position on the first day of a new bi-monthly pay period, or Friday, September 16, 2022.

18. Brisson arrived at work early that day, not realizing that full-time employees at SHA worked 8-12 on Fridays. No one appeared to be at work yet. Brisson did not have the alarm code for the building so she waited in her car in the back parking lot until the first employee arrived who could let her in the building.

19. That employee was Tasha Gibbs, another Occupancy Specialist, and she arrived around 7:45 a.m. As Gibbs entered the back entrance, Brisson followed her into the building.

20. Brisson first went to the breakroom to put up a few things she brought to the office and Gibbs went past her, down the long hallway past the breakroom towards her office.

21. A few moments later, Brisson heard Gibbs spraying something all up and down the long hallway outside of Brisson's previous office. Brisson noticed that the spraying was not short bursts of spray; but long continuous "runs" of spray.

22. Brisson could hear Gibbs moving around the offices and spraying

in the receptionist area, the lobby, in Gibbs' own office and also two offices across the hall from Gibbs, including the one that Brisson was, later that day, expected to occupy in her new position.

23. Brisson panicked because she could hear that Gibbs was spraying heavily, and Brisson had never encountered this before now, and it threw Brisson into a panic because she knew that with the amount of spraying that she heard, that she was going to have a serious reaction to the spray.

24. Brisson knew that her manager, Cameron Allison, was not in the building yet, so Brisson felt like she needed to speak to Gibbs about why and what she was spraying.

25. Brisson quickly went down the hall and asked Gibbs what she was spraying, and Gibbs replied that she was spraying "Clorox" and when Brisson asked why, Gibb explained that she was spraying to "kill the Covid germs left in the air from yesterday." Gibbs then volunteered that other employees in the office liked her to spray their office, also.

26. Brisson was already starting to feel symptoms from her exposure to

the spray:  her head had started to hurt, her right ear was filling with fluid from the allergic reaction, her sinuses were starting to feel irritated.  She was panicked emotionally due to the fumes in the air which felt suffocating to her and she felt her chest getting tight due to the constriction of her bronchial tubes.

27. Brisson quickly explained to Gibbs that she was very sensitive to breathing the spray and awkwardly tried to explain her chemical sensitivities.

28. Gibbs said something like "she was sorry" and did not know. Brisson then, trying to be diplomatic, mentioned to Gibbs that the spray didn't actually  kill Covid germs.  Brisson was not angry or rude to Gibbs in any way, even though Defendants later accused her of being so.

29. After this exchange, Brisson felt like the only thing she could do was go into her office, close the door, and open her window as quickly as possible to get some fresh air. She then learned that the window in her office did not open.

30. Brisson knew that when she closed her door if might not make a

10

good first day impression, but she was panicked. Her manager, Cameron Allison had not arrived yet, so she could not consult with him.

31. She knew that it was her first full day in her new position, and she wanted to make a good impression, but she felt like she had already failed. She really just wanted to go outside and get fresh air while the smell in the building cleared but thought this would look even worse to everyone and no one would understand. Brisson was so upset that she took a half a Xanax to help reduce her anxiety.

32. Around 8:00 a.m., Plaintiff could hear Gibbs and Stephanie Bruce, Occupancy Specialist and FSS Coordinator, talking near the doorway of the break room. Brisson also heard her manager, Cameron Allison, at the breakroom, and it sounded like he had stopped to talk and say good morning and briefly talk with Gibbs and Bruce.

33. Brisson then heard Allison ask, "Where's Semone?" to which Gibbs replied, "She's holed up in her office!" laughing loudly, which embarrassed and humiliated Brisson because it was her first day,

11

full-time, in this position and she now knew that she had not made a good impression. Instead, she was being ridiculed. This feeling was on top of being panicked about being trapped in a building feeling like she was about to suffocate.

34. A few minutes later Allison opened the door to Brisson's office and entered. Brisson asked him to please close the door behind him. Brisson then told Allison that she was sensitive to aerosols and that Gibbs had sprayed disinfectant spray all over the offices and hallway.

35. Brisson told Allison that chemicals and fragrances in general affected her sinuses and bronchial area and caused her headaches and other problems. Allison did not respond to these disclosures in any way, but told Brisson that she would be training with Samone Cowan that morning, and the following week to learn move-ins, and after that she would be training with Gibbs to learn recertifications.

36. Later that morning, Brisson felt like she needed to address her chemical sensitivities with Allison and did so. At that time, he told Brisson that he would speak with Gibbs.

37. He also pointed out that there would be occasions when a tenant or applicant might come into someone's office and if their personal hygiene was not good, a staff member might spray disinfectant or air fresheners after their visit to attempt to eliminate the strong foul odors.

38. Brisson pointed out that spraying Clorox spray would not achieve the purpose that Gibbs said she was trying to accomplish: to kill off Covid germs in an area as large as the SHA offices. Allison declined to agree or disagree with Plaintiff on that point.

39. Brisson then decided that later that day she would try to speak with Gibbs to make sure she wasn't upset with Plaintiff and because she wanted to start her full-time working relationship with Gibbs on good footing and without misunderstandings.

40. Brisson approached Gibbs and explained to her that Brisson wasn't upset at her, but only that she was in a panic earlier regarding the effects of the spray. Gibbs told Brisson that she understood and it wasn't "a big deal". She even said, "Lord, girl, I'd never hurt you!" and tapped Brisson on the shoulder with her hand when she said

13

this, and she laughed. Brisson was unsure if Gibbs was being sincere because she did not know Gibbs very well.

41. Brisson decided to arrive at work at the same time that Gibbs did going forward. After Plaintiff's first full-time day on the job on that Friday, Gibbs did not spray again and it appeared that she had decided not to do so, for which Brisson was grateful. But Brisson was worried because the can of disinfectant/deodorant (Clorox) spray was still sitting out on the credenza at the receptionist area, within easy reach of staff.

42. Brisson continued to be concerned about a commercial, wall mounted, Airwick automatic air freshener sprayer in the lobby near the receptionist door. During the previous summer, and after Brisson began full-time employment September, Brisson noticed a slight fragrance in the air at times, in the lobby, by the door leading from the receptionist area to the lobby. Brisson didn't seem to notice fragrances further down the hallway, toward the breakroom or towards her old office further down the hall, that she had occupied part-time during the summer.

43. Brisson's regular schedule was 7:30 a.m. until 5:00 Monday through Wednesday, Thursday 7:30 – 3:30pm, and Friday, 8am-12pm. These were the general hours for all full-time administrative staff. On Thursday afternoons, SHA maintenance staff cleaned the offices and ran some type of equipment that was supposed to sanitize the air from Covid-19 bacteria.

44. Brisson, Gibbs and Bruce each worked from the receptionist desk for three 3.5 hour shifts each week to be the "receptionist" since the previous receptionist had been fired.

45. Brisson's receptionist duties were on Tuesday, Wednesday, and Thursday mornings 9a to 12:30p. Gibbs worked Monday 9a to 12:30p and Bruce worked Friday 9a to 12:30p and they split the. remaining afternoons sessions from 12:30 – 4:00 pm. The lobby closed to the public at 4 and the offices closed at 5.

46. While working at the receptionist desk, one could slip off to one's office and work if it wasn't busy because if tenants entered the office, they could ring a bell if no one was up front. And even if an employee was not on receptionist duty, if the receptionist became

too busy, Gibbs, Bruce, and Brisson were expected to hop up from their desks and "help" out so no one had to wait.

47.    Because of limited space at the "teller" / receptionist window, some staff would step through the door into the lobby and assist residents from the lobby.   Everyone's office door usually stayed open because SHA staff were often in and out of each other's offices, along with other staff from accounting, and maintenance. The only staff person whose door was typically shut was Cameron Allison, if he was meeting with  an employee or tenant.

48.    Brisson was assigned to handle tenant move-ins. To this end, a large whiteboard to track turned apartments with move-in dates and move-out dates,   expected evictions, turn dates, etc., was located in her office, so everyone (Defendant Moore, Allison, Adam Conte, the Maintenance Director, and Gibbs) could see the status of these apartments.

49.    Brisson's first full week of employment she focused on training on "move-ins" with Samone Cowan.  Brisson and Cowan showed and leased multiple apartments.  Despite any faint odors, if any,   at

these locations, Brisson was able to do her job because they were only in the apartments about 20 minutes with each showing, followed by being out into fresh air and she was not exposed to any cleaning products.

50. Kim Johnson, Finance Manager, for whom Brisson had previously worked, was out on vacation Friday, September 16, Brisson's first day, and returned on Tuesday, September 27, 2022.

51. On Monday, Brisson filled in for Gibbs in the morning as receptionist because she was out with a sick family member and in the afternoon, Brisson trained in her own office with Samone Cowan.

52. On Tuesday, Plaintiff worked as receptionist in the morning and then again trained with Samone Cowan in the afternoon.

53. On Wednesday, Gibbs returned to work, having been out on Monday and Tuesday. Allison, manager for Bruce, Brisson, and Gibbs, insisted that if one of them was out and missed their scheduled receptionist day, that they work it out among ourselves to change the schedule to provide equal receptionist coverage.

54. Because Brisson was supposed to work as receptionist again on Wednesday morning (September 21), but was also trying to train with Cowan that week, after Brisson arrived at work on Wednesday, she asked Gibbs if she would take Brisson's morning receptionist duties since Brisson had filled in for her the previous Monday morning.

55. Gibbs reacted with a big heavy deep breath but didn't say anything. She then picked up her work, and moved to the receptionist desk where slammed her materials down on the desk and seemed upset.

56. As Allison was telling Brisson what he had told Gibbs and making it sound like he was trying to get Gibbs to accept Brisson as part of the administrative team, Brisson realized that management seemed more concerned about how Gibbs felt about Brisson than about Brisson's exposure to the chemicals in the workplace to which Brisson had been exposed. Allison, at one point even told Brisson that she had hurt Gibbs' feelings.

57. On Thursday, September 22, 2022, office hours were 7:30a to 3:30 pm so that maintenance staff could clean the office, reportedly

18

using some kind of "fogger" to kill Covid germs. In the past, Brisson had never noticed anything in the air when she came in on Fridays and on Friday, September 23, 2022, she likewise did not notice any smell or experience any symptoms.

58. The next week, Brisson worked her normal schedule on Monday , September 26th and Tuesday, September 27th. She was continuing to work with Cowan and on her own. Brisson attempted to assist Cowan by placing calls to wait-list applicants and various duties.

59. Brisson thought everything seemed like it was moving along well and she felt very comfortable about being able to do the job. She did notice that the can of disinfectant spray was still on the credenza at the receptionist area, and that there was still a can of air freshener in the bathroom. Brisson recalled that the air freshener had been there in the unisex bathroom the entire time she worked in the SHA office, including part-time during the summer, and that the can of disinfectant/deodorant spray also remained on the credenza in the receptionist area during this time as well.

60. At some point during the second week, Brisson offered to help Gibbs with getting her printer to work after Gibbs told her that her printer had not worked for "about a year" and that she constantly had to go into the receptionist area to get her work off the large commercial printer/copier. Brisson tried a variety of ways to make the printer functional including giving Gibbs her own printer cable. During the process, Brisson determined that the printer needed more ink and as Julia Rex passed by the office, she asked her to order Gibbs more ink.

61. After two relatively successful weeks at work in her new position, and only the one chemical exposure incident, Brisson felt upbeat and positive about her position and the office situation.

62. However, that changed her third week of employment, on Tuesday, September 27, 2022.

63. Brisson had arrived at work at her normal time, entered the building as usual through the back entrance, and worked all day and trained with Samone Cowan.

64. Kim Johnson was the SHA finance manager, for whom Brisson had

worked prior to her full-time position working for Allison. Johnson had been out on vacation since Brisson's first day of work on September 16, 2022, when Brisson started her full-time position. Upon Johnson's return to the office, Brisson was excited to catch up with her and to find out what was going on with her. Brisson decided to take the last ten minutes of her day on Tuesday and drop by Johnson's office.

65.  When Brisson walked down the hallway by the breakroom, the hallway was full of air freshener.  Noticing this, Brisson paused briefly at Kim's office and said something like, "I've been meaning to catch up with you. But the air freshener in the hallway is a bit strong.  I don't think I can stay right now."

66.  Nearby, Julia Rex was in her office and after Brisson spoke to Johnson, Rex then asked Brisson if she had smelled a "funny odor" in the hallway when she came into work that morning -- to which Brisson replied that she had not smelled anything at all.

67.  Then Julia informed Brisson that she had had Mark Boltz from maintenance refill the air freshener. Brisson knew she was

referring to the commercial air freshener mounted at the top of the wall in the hallway near the breakroom and the back exit.

68. Brisson felt awkward because she knew she needed to leave to avoid further exposure to the chemicals in the air freshener, and she was disappointed not to be able to visit with Johnson for a moment. Moreover, she was upset because Rex had had the air freshener refilled which made it apparent that management had not educated the staff on Brisson's chemical sensitivities and the need to avoid unnecessary introduction of chemicals into the offices. Brisson felt her sinuses reacting already, and so she left work about 10 minutes early at around 4:50pm.

69. As she was leaving, Brisson texted her manager Allison about leaving early and explained about the air freshener being refilled and asked him if he could have the air freshener taken down, since it had previously not been used, and if he would please make sure that the employees in the office knew about Brisson's chemical sensitivity. Allison did not respond to Brisson's texts.

70. The next day, Wednesday, September 28, 2022, Brisson

experienced her second chemical exposure that week, the third exposure during her three weeks of employment.

71. Brisson arrived at work at 7:30a and at 9:00 am moved to the receptionist desk to work from 9:00a – 12:30p as receptionist.

72. Close to 10:00 a.m. Brisson noticed a strong fragrance in the hallway in front of her office which was across the hall from Gibbs' office. The fragrance was very strong and so Brisson immediately closed the door to her office to keep the fumes from continuing to go into her office, even though she knew that people in the office might think this rude.

73. Brisson did not say anything to anyone about the fragrance and fortunately, the fragrance was not headed toward her desk in the receptionist area. However, Brisson knew that there was no guarantee it would not eventually end up coming her way, so she walked down the hall to Allison's office to speak with him. He was not in his office, so Brisson walked back to the receptionist area and sent him a text.

74. Brisson did not know if Allison had spoken to Gibbs about Brisson's

sensitivity, but Brisson knew that she had told Gibbs on Brisson's first day of work. Brisson assumed that Allison had told Defendant Moore but did not know for sure.

75. Brisson's text to Allison stated: "Cameron, May Brisson speak with you privately as soon as you get a chance?" A few minutes went by, and Brisson received no response.

76. While Brisson waited for Allison to respond to her text message or return to his office, Brisson had down time at the receptionist desk, so she went online and printed out two articles from the internet about the dangers of chemicals in air fresheners to humans. One article was from the National Institute of Health website. It had many references to research data at the end of the article. Brisson thought this might be a considered to be a credible source of reliable information.

77. The second article was less scientific, but explained the matter in an understandable way for the average person. Brisson believed that the articles might help Allison understand more about her condition.

78.     As soon as Brisson heard Allison return to his office, she took the two articles to him in his office, asked to speak with him privately, and closed the door.

79.     Brisson told Allison that Gibbs was burning a scented candle in her office and that the fumes were going into Brisson's office so Brisson had closed her door.  Brisson also stated clearly to avoid any misunderstanding that she had health issues regarding sensitivity to fragrances, especially air fresheners, some perfumes (if heavy), scented candles, aerosols like Lysol, of course the Clorox spray (which he already knew about).

80.     Brisson also told Allison that she knew she was also sensitive to Pine Sol, Citronella, any citrus-based (orange/lemon) fragrance, GoJo hand cleaner and similar mechanic-type hand cleaner products with citrus fragrances and that she avoided the laundry detergent aisle in the grocery store.

81.     Brisson told Allison that she had had the sensitivity for a long time and that exposure to the fragrances and chemicals caused Brisson to get headaches, suffer sinus inflammation, and exposure affected

her bronchial tubes and could make her fatigued and have mental fogginess as a reaction.

82.    Brisson also told Allison that both her parents had the same allergies/chemical sensitivities and that her mother, after working in a fabric store for two years, developed allergies to formaldehyde and had been diagnosed with the onset of lupus attributed to her exposure to the "finishing" chemicals in the new fabric.

83.    Brisson then gave Allison the articles she had printed out and asked that he share the information that Brisson had provided with Defendant Moore so that an awareness of Brisson's condition might make others in the workplace more sensitive to Brisson's condition and that some policies or practices could be put in place to reduce Brisson's exposure to harmful chemicals/fragrances.

84.    Brisson also told Allison that she was aware that Rufty-Homes Senior Center in Salisbury had adopted a "scent-free" workplace policy and that people with noticeable fragrances were asked to leave and return without the scents/fragrances. Brisson told Allison that one participant at the Senior Center had a severe breathing

reaction to an air freshener in the bathroom which resulted in him going to the hospital in an ambulance.

85. Brisson also tried to tell Allison that others besides her, such as residents or applicants could also suffer as a result of encountering these chemicals in the SHA offices and that children with asthma could have a serious reaction to the airborne chemicals in our office.

86. Brisson also told him that she felt that she was being placed in the awkward position of advocating for her health in the workplace even though she had informed Allison previously and that she was at risk of alienating her fellow co-workers if management did not step up and help her with managing the fragrances/chemicals in the workplace and that Brisson did not want to be the "bad guy."

87. Finally, Brisson told Allison that she hated that Brisson could not be like "most people" and that she hated to have to even have to bring the subject up, but her health was stake because chemical sensitivities affected her everyday life and that it often affected her quality of life and her family's quality of life and she gave him two examples of this so he could see how hard it was for her in everyday

situations.

88. Brisson explained that when she had managed Fleming Heights, she could smell from a foot away of a resident's apartment door if they were smoking in their apartment, which was prohibited. Brisson also told him that if her husband had washed his hands with Go Jo outside the house, she could tell immediately when he entered the house.

89. Allison listened patiently, but the only substantive response he gave Brisson was that he would "talk with Tasha" and he would "let Bradley know."

90. In hindsight, Brisson realized that Gibbs had been complaining about Brisson's hire into the full-time position. She realized this during her conversation with Allison, when he told Brisson that he had been explaining to Gibbs how much help Brisson was going to be to her, and told her to " just to hang in there;" and that she "would see what a big help that Brisson would be to her and that it would be worth it."

91. At the time, Brisson did not realize that Gibbs had been

28

complaining about her, presumably as a result of Brisson's asking her not to spray chemicals and because she asked Gibbs to take the receptionist duties on Wednesday, September 21, after Brisson had subbed for her on the preceding Monday.

92. After Brisson left Allison's office that morning after discussing her sensitivities and telling him about the candle, Brisson entered the bathroom that she always used on the hall closest to her office. Everyone knew Brisson used this bathroom multiple times a day because hydrated frequently.

93. Immediately, she smelled that the bathroom was absolutely filled to the brim with air freshener, as if someone had done it on purpose. There was no underlying smell or foul odor that were being masked.

94. Brisson knew that everyone on her end of the hall (Gibbs, Cowan, and Bruce) likely knew that she had been in Allison's office for an extended period -- they saw his door shut, and because Brisson was absent from the receptionist desk, they would have had to cover for Brisson at the lobby window, including answering the incoming phone calls (part of the receptionist duties).

95. On Thursday afternoon, September 28, 2022, Allison texted everyone and forwarded a message from Defendant Moore to the effect that the office would be closed on Friday due to "expected bad weather." No texts or emails were sent, as far as Brisson knew, about her sensitivity and the need to avoid the use of chemicals/fragrances in the office.

96. Brisson returned to work on Monday, October 3, 2022, at approximately 7:30 am.

97. At this point in time, Moore had not spoken directly to Brisson about any of her health concerns, or concerning the fragrance or disinfectant spray issues and again Brisson was not aware of any interoffice communications concerning her sensitivities. Brisson was unaware whether Allison had actually spoken to Moore or to Gibbs as he had said he would on September 28.

98. Allison had informed Brisson the previous week, that on Monday October 3, she would be training with Gibbs on recertifications in her office. After Brisson entered the building, she went to her office, stopping at Gibb's office door to say "good morning" to her.

Brisson noticed that Gibbs was not in her office, but at the receptionist desk, and that Gibbs' office smelled of some type of fragrance, which alarmed Brisson because she knew that she was expected to train with Gibbs that day. Brisson was concerned because she was still encountering fragrences.

99. Gibbs walked up to Brisson from the receptionist area and Brisson asked her about the fragrance in her office. Gibbs said she did not know about the source of the fragrance in her office, and offered that perhaps "it could be the air freshener in the lobby." Brisson stated that she thought the lobby air freshener wasn't working, and Gibbs then offered that maybe the fragrance was Gibbs' own body wash.

100. Brisson then told Gibbs that she knew they were supposed to train together today and asked if they could possibly work in Brisson's office instead of Gibbs' office.

101. Brisson knew that even though Gibbs had receptionist duties in the morning, they most likely would be in Gibbs' office that morning at some point, and for sure during the afternoon. Brisson then went

31

into her office and sat down at her computer and thought long and hard – at least 5 minutes or more about what to do next and how to manage the situation to avoid hurting Gibbs' feelings, avoid chemical/fragrance exposure, and accomplish the training tasks assigned by Allison. Because Allison had not dealt with the situation which he knew about from Brisson's first day of full-time work in the office, Brisson was forced to be proactive in trying to figure out the source of the fragrance she was smelling.

102. Brisson knew that because of how Moore had treated Brisson in the past that he likely knew about Brisson's issues but had decided not to address them and let Brisson fend for herself in the workplace. Brisson knew that Allison always deferred to Moore and that neither of them liked to "rock the boat."

103. Brisson knew that if they had wanted to address her sensitivities, that they could have taken very simple actions which would have gone a long way towards preventing any unnecessary exposure. For example, they could have taken the air freshener cans and dispensers out of the office and asked staff not to spray chemicals

32

or fragrances or burn candles. Brisson knew that if these changes came from management they would not be resisted if other employees could see they were supportive of Brisson.

104. Brisson sat at her desk literally staring at her computer screen, anxious about what to do, and considered her options. At first, she thought she was going to wait for Allison to come in the office and then go speak with him in person. But then she considered that she had just spoken with him about the same issues the previous week and he had taken no action apparently, so she did not want to appear as though she was telling him what to do or complaining again which is how she would be viewed by him and the other employees.

105. Finally, Brisson decided it would be better if she just sent Allison an e-mail and thought about how to word it. Finally, she decided that the best and safest thing to do was to just simply state the facts in the email and put the ball in Allison's court and hope he could figure out a solution to the problem.

106. Brisson purposefully did NOT copy Moore on the email because he

Case 1:23-cv-00891-WO-JLW    Document 1    Filed 10/20/23    Page 33 of 57

had not been involved with Brisson at all at that point, and she had been dealing directly with her manager (Allison) about the problem.

107. The gist of the email was: "Cameron, I am supposed to train with Latasha today. I came in to work and smelled fragrance in Gibbs' office. When I asked her what it might be, she said it may be the air freshener in the lobby, then she backed-up and said it might be her body wash. Please advise. Semone"

108. Brisson sent the email and then began to settle in to work, hoping and expecting that later that morning, Allison would catch up with Brisson and hopefully ask her to discuss the matter in his office.

109. Instead, what happened next shocked Brisson and caught her completely off-guard. Within about 10 or 15 minutes of sending the email to Allison, Brisson heard someone coming down the hall. Brisson looked up and saw Moore standing outside of Gibb's open office door.

110. Moore stood there only there a moment, saying nothing, and then he turned and stood outside Brisson' open office door. He had both feet in the hallway and stood just at her open door. He was turned,

34

facing her. Brisson assumed from his stance that he was going to briefly speak to Brisson then move back down the hall towards his office. Moore did not enter Brisson's office and appeared to be poised to leave quickly.

111. Again, Brisson had been dealing only with Allison for the past two weeks concerning her disability and complaints, and Moore rarely spoke to Brisson in person directly about business. He preferred to communicate with Brisson through Allison, her manager.

112. As Moore stood there outside Brisson's open office door, he did not say, "Good Morning" or "Can I have a word with you in my office?" but very emphatically, he looked at Brisson and stated loudly, "**What's the problem**?" in a very irritated and confrontational tone, without a trace of concern or empathy for Brisson, and without any regard for everyone in the office and down the hall to hear him speak to Brisson that way.

113. Brisson felt attacked and knew immediately that Moore was not seeking to understand her health concerns, but was instead irritated, impatient, and had his own agenda which did not include

taking any action to address Brisson's sensitivities.

114. Brisson knew that Moore was the same person who as the Executive Director of the SHA could be "the good guy" as on the previous Thursday when told everyone to stay home from the "storm to take care of your family" as he did in the text message closing the office for the previous Friday.

115. Brisson found that "good guy" persona difficult to square with the same person who was standing in her office door loudly demanding to know, in earshot of the entire office, what Brisson's "problem" was instead of coming into her office, closing the door and asking calmly to discuss the matter with her.

116. At this point Brisson was shaken to the core because Brisson then realized Moore was not there to help her but there to attack Brisson in front of everyone. The only thing Brisson could think of to do was to express her frustration and puzzlement that he had not discussed the issue with Allison to understand the problem. It was very obvious that his loud words were an attempt on his part to put Brisson on the spot in front of the other four employees down the

36

hall – who almost always had their office door open.

117.    Brisson, in disbelief, replied to Moore, "You mean you don't know what the problem is?"  Brisson was emotionally upset by now and it took effort to control the emotion in her voice.  Brisson then said to Moore that she was thought Allison had been telling him about her sensitivities for the past two weeks.

118.    Moore said "No," and continued to stand there looking at Brisson.

119.    Brisson was in shock from the realization that she was going to have to have a conversation about her disability in front of the entire office and the incredulity she was feeling that Allison had not discussed the situation with Moore, and yet here Moore was standing outside her open office door asking her what her "problem" was.

120.    Not understanding why Moore was in her office if he did not know about her chemical sensitivities and him asking her what her problem was, Brisson repeated herself and asked him again if he really did not know what the problem was.

121.    Again, Moore said only "No. Tell me."

122. It was then crystal clear to Brisson that Moore was going to make her discuss her disability and details about it in front of everyone on the hall.

123. So, under this emotional duress, Brisson tried to quickly summarize her disability and struggles within earshot of everyone she worked with. This triggered the trauma that she has suffered in the past resulting from the stigmas attached to people with chemical sensitivities. Brisson knew that many people did not believe chemical sensitivities were real, and that many people did not understand how chemical sensitivities "worked," that is what substances triggered reactions and what the physical repercussions were as the result of exposure to air borne chemicals/fragrances.

124. Brisson tried to calm down and to explain to Bradley the gist of the "problem," as Moore described it, that she suffered from chemical sensitivities and that she experienced physical symptoms whenever she encountered air fresheners, chemical aerosols, certain cleaning products and heavy perfume.

125. It was apparent to Brisson that Moore wanted a quick fast answer

38

and that he seemed to have already made up his mind that there was no "problem," at least for him. Brisson felt rushed and regretted not being able to have an in-depth conversation about the issue with someone who really cared about how to make the situation better.

126.    Brisson believed Moore was trying to find an easy "out" as she had observed him do in the past when "problems" were identified. And it seemed to Brisson that Moore had always valued "going along to get along" rather than addressing hard issues. Brisson believed that he was unlikely to institute a scent free workplace policy if he thought that staff would be upset with it, even if that solution would have been a reasonable accommodation for Brisson's disability.

127.    At some point during Brisson's attempt to explain her disability, Moore stated that he did not smell anything in Gibb's office. Brisson then explained that she was sensitive and that she did smell something.

128.    Moore then responded to Brisson by stating that Brisson "never had this problem before," and that Brisson had worked in **his** offices all

summer without complaining about any smells.

129. Brisson then explained that she was only working in the offices two mornings a week, for four hours a day, in a different office down the hall, and that she had not encountered any problem during that time, because if she had, she would have told someone.

130. Moore than stated to Brisson, "You can't do your job. You will be in an out of apartments that smell like cigarette smoke. And you'll be in apartments that maintenance has cleaned, smelling cleaning products."

131. Brisson knew that in all of her previous positions between January 2018 and that day, she had been able to create her own accommodations by working with others, such as cleaning contractors who agreed to use products that did not trigger her sensitivities. Further, any exposure that she would have had in dealing with tenants would be temporary and followed by an ability to access fresh air immediately thereafter.

132. Brisson attempted to explain to Moore that it was a very different situation when she was trapped in an office with air fresheners and

candles and other sources of chemical and fragrance exposure which she could not avoid because she could not even open her window to get fresh air.

133. Brisson told Moore that he controlled the office environment and the situation she was in. She did not have the chance to point out that she had gone two weeks in the job with no prolonged chemical exposure other than on the first day and that nothing had happened until week three of her full-time employment in the office.

134. Moore then stated to her that she had "hurt Tasha's feelings," which was just what Allison had told her in response to her disclosure of her disability. Shocked by Moore's lack of sensitivity regarding Brisson's health concerns and his obvious concern about Gibb's feelings over her health, Brisson then asked Moore, "What about me, Bradley? What about my health concerns??"

135. At this point, Moore told Brisson to gather her things and go home for the day while he figured out what to do. He also stated that he could not control every situation that Brisson was in on the job. Brisson told him that he could control the office environment where

41

Brisson spent most of her time and that chemical exposure could also affect tenants or other office visitors and that it could create a workers' comp situation.

136.  After Brisson mentioned workers' compensation, Brisson saw a change in Moore's face and it appeared to Brisson that he had taken her reference to workers' comp as a threat.

137.  The next thing Moore said was "You don't get along with people" which Brisson thought was completely out of the blue and unrelated to her disability.   In addition, it occurred to Brisson that if "people" meant Gibbs or others in the office, any problems or hurt feelings had been caused by management's failure to address an issue they knew about on day one of her full-time employment.

138.  Moore also accused her, stating "You don't respect authority!" Brisson then stated that she respected authority that respected her. Moore then stated that he knew that he should have never hired Brisson for her position and then told her, "Take your things and go home for good!" and turned to walk off.

139.  Brisson then asked him if he was firing her.   He didn't answer

Brisson but headed down the hall back towards his office.

140.    Brisson knew that Gibbs was in her office across the hall, and Bruce, in the office next to Brisson's office, had heard everything and that it had been very quiet in the hall while Moore was in her office.

141.    Brisson gathered her belongings and walked out of the building. Later, Brisson asked for a letter stating the reasons she had been terminated, but Moore refused to send her one, stating that she was a probationary employee.

142.    Brisson knew that no one had spoken to her in the past about not getting along with "people." Brisson also knew that she had been able to do her job since 2018 by working with individuals who were willing to work with her to minimize her exposure to chemicals/fragrances to which she was sensitive.

143.    For example, Brisson had implemented a fragrance-free policy with the contracted cleaning staff who cleaned common areas/public bathrooms twice per week. Brisson implemented the fragrance-free cleaning policy to protect herself, and any guests, and residents who

had lung issues, of which there were several.

144. Brisson was also able to manage her disability in her previous positions because she was in control of her own office space which had a door and working windows. Brisson had also dealt with a resident who had complaints regarding smoking even though it is a smoke-free building and also with the over use of air fresheners because those conditions affected her breathing to the extent that she had on occasion ended up in the hospital.

145. Brisson knew that for the four years she had worked at Fleming Heights, she was in and out of apartments, performed inspections, move-ins, move-out inspections, and dealt with smokers even though the facilities were supposed to be smoke-free. Moreover, Brisson had been in apartments when maintenance was cleaning or painting, and on occasions when they used strong smelling cleaners or paints, Brisson limited her exposure and was still able to do her job.

146. Brisson often went in vacant apartments after they were "turned" by maintenance and she sometimes experienced short exposures to

Case 1:23-cv-00891-WO-JLW    Document 1    Filed 10/20/23    Page 44 of 57

chemicals but those exposures never affected her ability to do her job because she spent the majority of her time in well-ventilated areas free of chemicals. In truth, on average per Cowan, Brisson knew that in her full-time position, she would only be in apartments a fraction of each week (20 – 40 minutes maximum each week during a 40-hour work week.

147. Moreover, Brisson had been in apartments during the first and second week of her full-time employment and had never experienced even any short-term exposure to any chemicals/fragrances, much less any more long-term exposure. Thus, she knew that she could manage any exposure to chemicals/fragrances in apartments just as well as she did in her previous positions.

148. Defendant Moore was aware that Plaintiff had a disability at the time he terminated her.

149. Moore did not offer to work with Plaintiff to identify a reasonable accommodation that would allow Plaintiff to maintain her full-time position.

150. Instead, when Plaintiff sought a reasonable accommodation for her disability, Moore took an adverse action against her and terminated her for making a request for a reasonable accommodation.

151. When defending Plaintiff's EEOC charge, Defendants asserted that immediately after Brisson's exposure to the fragrance candle, Moore immediately directed those candles not be lit in the office in the future, and removed the air freshener from the hall. If he did this, Brisson was unaware of it, and he did not tell Brisson that he had done so.

152. Moreover, if he had done so, then presumably when he approached Plaintiff's office on the morning of October 3, 2022, he would have informed her of this action that he had taken, rather than ask her what her problem was.

153. Defendants also argued that Brisson

exhibited other concerning behavior as well, such as continuously making negative remarks towards her co-workers, and refusing to cooperate with routine work procedures including mandatory training for her new position. . . . For instance, Ms. Brisson complained about being trained by two SHA employees, Ms. Samone Cowan and Ms. Gibbs, and asked to only be trained by Ms. Cowan, rather than Ms. Gibbs. However, during training with Ms. Cowan,

46

Ms. Brisson proved unreceptive, continuously asked questions completely unrelated to the training topic, and disrupted all efforts to effectively train her for her new role.

154. Brisson was never counseled about being "unreceptive" or asking unrelated questions. Moreover, she was performing all the duties and responsibilities of her position at the time Moore terminated her.

155. Prior to the EEOC charge, neither Brisson's supervisor, Cameron Allison, nor Bradley Moore, expressed any concerns about Plaintiff's training with Cowan. In addition, Brisson never requested not to be trained by Gibbs, but only asked that the training occur in her office to avoid exposure to fragrances she had smelled in Gibbs' office.

156. Brisson did express surprise that the receptionist position had not been filled and that she, Bruce, and Gibbs were expected to spend a significant amount of time serving as the receptionist, but Brisson accepted the assignment and performed this duty on the same terms as Bruce and Gibbs.

157. The accusation that Brisson told Gibbs that her "body smell would

make her sick" is absolutely false and was manufactured by Defendants after the fact as pretext for the fact that Moore fired Plaintiff because she asked for a reasonable accommodation for her chemical sensitivities.

158. Rather than engaging in the interactive process to address Plaintiff's request for an accommodation, Moore decided to summarily fire Plaintiff on October 3, 2022, immediately after Moore forced Plaintiff to have discussion with him about her disability in front of the office staff, made statements implying that she did not have a disability, accused her of being unable to do her job, and being unable to get along with "people."

## COUNT ONE
### Failure to Provide a Reasonable Accommodation in Violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12181 et seq.

159. Plaintiff repeats and realleges paragraphs 1 through 158 hereof, as if fully set forth herein.

160. Plaintiff suffered from a condition which rendered her a "qualified individual with a disability" within the meaning of 42 U.S.C. § 12111 of the ADA. Plaintiff could perform the essential functions of

48

her position with or without a reasonable accommodation.

161. On September 16, 2022, Plaintiff notified Defendants about her disability and requested a reasonable accommodation,

162. Defendants refused to engage in the interactive process and denied Plaintiff's request, and discriminated against her based on her disability and her protected activity by firing her on October 3, 2022, by refusing to give her a termination letter with any reasons for her termination, and later in response to her EEOC charge, by claiming that she engaged in unsatisfactory performance as pretext for discrimination and retaliation.

163. Plaintiff suffered damages as a result of Defendants' unlawful discriminatory actions, including past and future lost wages and benefits, emotional distress, and the costs of bringing this action.

164. Defendants intentionally violated Plaintiff's rights under the ADA with malice or reckless indifference and, as a result, are liable for punitive damages.

**COUNT TWO**
**Retaliation in Violation of the**
**Americans with Disabilities Act**
**42 U.S.C. §§ 12181 et seq.**

49

165. Plaintiff repeats and realleges paragraphs 1 through 164 hereof, as if fully set forth herein.

166. Plaintiff was qualified for her position when Defendants fired her.

167. On September 16, 2022, and on various dates thereafter, including October 3, 2022, Plaintiff engaged in protected activity by notifying management of her sensitivities to airborne chemicals and fragrances and asking her supervisor and Defendant Moore about modifications to the workplace that would allow her to work in an in environment which her risk to exposure to substances to which she had a known reaction.

168. Specifically, Plaintiff told both Allison and Moore that she suffered heightened sensitivities to chemicals and fragrance and sought their help reducing her exposure in the offices of the SHA.

169. Instead of receiving an accommodation or an opportunity to discuss an accommodation for her disability, Brisson was subjected to discriminatory treatment based on Brisson's disability and her requests for a reasonable accommodation.

170. Only three weeks after Plaintiff's first identifying herself as having

50

sensitivities to chemicals and fragrances to Allison and the same day she discussed her disability with Moore, Defendant Moore summarily fired Plaintiff on October 3, 2022.

171. Defendants fired Plaintiff because she complained of disability discrimination and asserted her right to a reasonable accommodation.

172. Plaintiff suffered damages as a result of Defendants' unlawful retaliatory actions, including past and future lost wages and benefits, emotional distress, and the costs of bringing this action.

173. Defendants intentionally violated Brisson's rights under the ADA with malice or reckless indifference and, as a result, are liable for punitive damages.

## COUNT THREE
### Discrimination and Retaliation in Violation of the the North Carolina Persons with Disabilities Act (NCDPA) N.C. Gen. Stat. § 168A-1 et seq.

174. Plaintiff repeats and realleges paragraphs 1 through 171 hereof, as if fully set forth herein.

175. Plaintiff was qualified for her position when Defendants fired her.

176. On September 16, 2022, and on various dates thereafter, including

October 3, 2022, Plaintiff engaged in protected activity by notifying management of her sensitivities to airborne chemicals and fragrances and asking her supervisor and Defendant Moore about modifications to the workplace that would allow her to work in an in environment which her risk to exposure to substances to which she had a known reaction.

177. Specifically, Plaintiff told both Allison and Moore that she suffered heightened sensitivities to chemicals and fragrance and sought their help reducing her exposure in the offices of the SHA.

178. Defendants refused to engage in the interactive process and denied Plaintiff's request and discriminated against her based on her disability and her protected activity by firing her on October 3, 2022, by refusing to give her a termination letter with any reasons for her termination, and later in response to her EEOC charge, by claiming that she engaged in unsatisfactory performance as pretext for discrimination and retaliation.

179. Instead of receiving an accommodation or an opportunity to discuss an accommodation for her disability, Brisson was subjected to

discriminatory and retaliatory treatment based on Brisson's disability and her requests for a reasonable accommodation.

180. Only three weeks after Plaintiff's first identifying herself as having sensitivities to chemicals and fragrances to Allison and the same day she discussed her disability with Moore, Defendant Moore summarily fired Plaintiff on October 3, 2022.

181. Defendants fired Plaintiff because of her disability, because she complained of disability discrimination and because she asserted her right to a reasonable accommodation.

182. Plaintiff suffered damages as a result of Defendants' unlawful retaliatory actions, including past and future lost wages and benefits, emotional distress, and the costs of bringing this action.

183. Defendants intentionally violated Brisson's rights under the NCDPA with malice or reckless indifference and, as a result, are liable for punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

A. Award Plaintiff for her past and future loss of wages and

benefits, plus interest;

B. Award Plaintiff compensatory and punitive damages;

C. Order Defendants to reinstate Plaintiff to a position comparable to her former position or, in lieu of reinstatement, award her front pay (including benefits);

D. Award to Plaintiff all costs and reasonable attorneys' fees incurred in connection with this action; and

E. Grant Plaintiff such additional or alternative relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims properly triable by a jury.

Respectfully submitted, this the 20th day of October 2023.

/S/ VALERIE L. BATEMAN
Valerie L. Bateman
NEW SOUTH LAW FIRM
209 Lloyd Street, Ste 350
Carrboro, North Carolina 27510
Tel: 919-810-3139
Fax: 919-823-6383
NC State Bar No. 13417

/S/ JUNE K. ALLISON
June K. Allison
NEW SOUTH LAW FIRM
233 S. Laurel Avenue
Charlotte, NC 28207
Tel: 704-277-0113
Fax: 919-823-6383
NC State Bar No. 9673

## VERIFICATION OF SEMONE BRISSON

SEMONE BRISSON being duly sworn, deposes and says:

That the contents of the foregoing COMPLAINT are true to her own knowledge, except as to matters stated on information and belief, and as to those matters, she believes them to be true.

_____

SEMONE BRISSON

Subscribed and sworn to before me this day

by SEMONE BRISSON

on the _____ day of _____ 2023.

_____

NOTARY PUBLIC

My Commission Expires:

_____

DATE

**VERIFICATION OF SEMONE BRISSON**

SEMONE BRISSON being duly sworn, deposes and says:

That the contents of the foregoing COMPLAINT are true to her

own knowledge, except as to matters stated on information and belief,

and as to those matters, she believes them to be true.

*Semone Brisson*
SEMONE BRISSON


Subscribed and sworn to before me this day

by SEMONE BRISSON

on the 20th day of October 2023.

JAYLAND SANDERS
Notary Public-North Carolina
COUNTY OF ROWAN
My Commission Expires: August 7, 2028

*Jayland Sanders*
NOTARY PUBLIC


My Commission Expires: August 7th, 2028

10/20/23
DATE


55